EDWIN BEARDSLEY et al., Assignees, etc., *v.* WILLIAM B. HOTCHKISS et al., Appellants and Respondents.

THE GENEVA NATIONAL BANK et al., Appellants and Respondents.

. The contracts of an infant are not absolutely void, but only voidable. As to executed contracts, they will generally be deemed ratified, unless disaffirmed by the infant before or within a reasonable time after his arrival of age.

*It seems* that as to a contract purely executory, it must be shown that the infant ratified it after he became of age before it can be enforced against him.

The defense of infancy is for the benefit and protection of the infant ; other persons may not set it up for their own benefit.

In 1844, L., being about to intermarry with H., entered into an ante-nuptial contract with him and W., by which she conveyed to W. all her real

estate in trust for her separate use during life. H. agreed, also, to join with L. in all assignments necessary to transfer her personal property to W., upon a similar trust. It was provided that L. might give, devise and bequeath all her property, covered by the contract, to H., or to any one or more of her issue, in such shares and proportions as to her should seem meet. L. was at the time a minor. The trustee never exercised any control over the property, but it was controlled by L. and her husband, she executing annually to W. a receipt in full for the amounts she was entitled to. After her marriage L. became owner of other real estate. She died in 1855, leaving five children and a will, in which, after referring to the ante-nuptial agreement, and setting forth the provision reserving to her the right to dispose of the property, was contained this provision : "Now, therefore, I * * * give, devise and bequeath unto such child or children as I shall leave or have living at the time of my decease, and to their heirs and assigns, forever, all of my real and personal estate of every name and nature, and wheresoever situated, and more particularly described in the instrument herein above referred to; provided, nevertheless, that in case either or any of my children, living at my decease, shall die before he or they shall arrive at the age of twenty-one years and without issue living * * * the share or estate of the child or children so dying shall vest in and belong to, and I give and devise the same to the survivors or survivor." H. was appointed executor, and, acting as such after the death of L., he took possession of, occupied and controlled the real estate, using its avails, and also the personal property, in his business. N., one of the children, died after the death of his mother before arrival of age, and leaving no issue. H. subsequently made a general assignment for the benefit of creditors, preferring his children. In an action brought by the assignees to determine the amounts to which the children were entitled, *held*, the facts authorized a finding that the contract was not disaffirmed by L. after she became of age ; that her will was intended only as an execution of the power of disposition reserved in the contract, and so did not affect property subsequently acquired ; that the limitation over to the surviving children, in case of the death of a child before maturity, was authorized by the ante-nuptial contract, and was not in conflict with the statute against perpetuities, either as it related to the real or to the personal estate, as upon the death of L., there were persons in being, *i. e.*, her children, by whom an absolute title to any of the property could have been conveyed.

*Manice* v. *Manice* (43 N. Y. 303), distinguished.

*It seems*, that title to the personal property of L. was not vested in the trustee by the ante-nuptial contract, but it operated as a release of the marital rights of her husband therein, and the title remained in her and passed to her children under the will which she was authorized to make, by the act of 1849. (Chap. 375, Laws of 1849.)

Also *held*, that the unexpended accumulated income of N.'s share passed, at his death, to his father as his next of kin.

Also *held*, that H. was not entitled, in diminution of his liability to his children, to any allowance for their maintenance and support during minority, it appearing that he was of sufficient ability to, and did support them from his own means without making any charge.

Also *held*, that H. was not entitled to any credit for the ordinary support and maintenance of his children in his home after they became of age, it appearing that they lived with and served him as children, not as boarders or servants; but *held*, that H. was entitled to credit for certain extraordinary expenditures for their education and traveling expenses.

Also *held*, that H. was properly charged with interest at the legal rates on all sums for which he was held liable.

(Argued May 2, 1884; decided June 3, 1884.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, entered upon an order made October 19, 1883, which modified, and affirmed as modified, a judgment entered upon the report of a referee. (Reported below, 30 Hun, 605.)

The nature of the action and the material facts are stated in the opinion.

*William F. Cogswell* for defendants Hotchkiss. The will of Mrs. Hotchkiss passed all her estate, real and personal, whether embraced in the deed or not. (1 Redf. on Wills, 385, 386.) The limitation over to the surviving brothers and sisters upon the death of any of the children under the age of twenty-one without issue was not void or in conflict with the Revised Statutes as to the accumulation of personal property. (2 Kent's Com. [11th ed.] 117, and notes; *Galligo* v. *Galligo*, 2 Brock. 287.) The effect of the marriage settlement was a release by Mr. Hotchkiss of his marital right to reduce to possession founded on a valuable consideration, and as such enforceable in equity. (*Bradish* v. *Gibbs*, 3 Johns. Ch. 523; *Wright* v. *Cadogan*, 6 B. P. C. 156; *Wadhams* v. *Missionary Soc.*, 2 Kern. 415, 422.) It was error to deduct from the sums of Fanny and Alice Hotchkiss the sums advanced for their wardrobe expenses after they respectively became of age. (*Wil-*

*liams* v. *Hutchins*, 3 Comst. 312; *Carpenter* v. *Weller*, 15 Hun, 134; *Wilcox* v. *Wilcox*, 48 Barb. 327.) Upon this state of facts it is entirely clear that Mrs. Hotchkiss had no such estate of inheritance as was necessary to give her husband a right as tenant by the curtesy, she had no estate in the land, but simply a right to receive the rents, issues and profits during her life, with power to appoint by her will. (1 Greenleaf's Cruise, 159; *Doe* v. *Rivers*, 7 Term R. 276; *Barker* v. *Barker*, 2 Sim. 249.) Mr. Hotchkiss should be charged with the full legal rate of interest. (Hill. on Trusts, 347, 374, marg. note; *Barney* v. *Saunders*, 16 How. [U. S.] 542; Perry on Trusts, § 468; *Cook* v. *Lowrey*, 95 N. Y. 103.) He was properly chargeable with interest during the whole period of time. (*Leotard* v. *Graves*, 3 Caines, 225; *Scott* v. *Guernsey*, 16 Barb. 163–180; 48 N. Y. 106.) His other creditors of have no right to insist that he shall charge his children for their maintenance and support. (Schouler on Domestic Relations, 322.) The ante-nuptial contract operated upon the personal estate to exclude Mr. Hotchkiss' right thereto. (*Wadhams* v. *Am. Home Miss'y Soc.*, 2 Kern. 415, 422.) The ante-nuptial contract was valid notwithstanding the infancy of Mrs. Hotchkiss at the time it was made, subject to her right to disaffirm the same. (Pollock's Principles of Contract, chap. 2; Capacity of Parties, Infants, p. 351.) By the ante-nuptial settlement Mrs. Hotchkiss had power to appoint the fund by way of conditional limitation, and was not required to allot the property in gross sums. (2 Sugden on Powers, 272, chap. 15, § 2; *Alexander* v. *Alexander*, 2 Ves. 640.) The law favors the vesting of estates, and a contrary intention will not be imputed to a testator unless unequivocally expressed. (*Manice* v. *Manice*, 43 N. Y. 303, 368; *Embury* v. *Sheldon*, 68 id. 227, 236; 8 Abbott's Digest, 1027.)

*A. P. Rose* for the banks, defendants. The general intent of the whole instrument, indicated by the preamble, must control any particular intent that may be gathered from the con-

tradictory expressions used later in the will. (*Charter* v. *Otis*, 41 Barb. 529.) The words "all my real and personal estate," used in the will, are limited and defined by the following words, "and more particularly described in the instrument," and only mean all the real and personal estate described in the ante-nuptial contract, and not any subsequently acquired. (*Monk* v. *Maudsley*, 1 Simons, 286–289; *Church* v. *Kemble*, 5 id. 525; *Lynes* v. *Townsend*, 33 id. 558; *Quinn* v. *Hardenbrook*, 54 id. 83; *Wilkes* v. *Ferris*, 5 Johns. 336; *Roe, ex dem. Connolly,* v. *Vernon*, 5 East, 51; *Doe, ex dem. Parkin*, v. *Bell*, 8 Term R. 579; *Holmes* v. *Hubbard*, 60 N. Y. 183.) If two expressions in a will are totally repugnant the last must prevail. (1 Jarman on Wills, chap. 15, p. 472; *Van Nostrand* v. *Moore*, 52 N. Y. 20.) In cases of powers, the suspension of alienation forbidden by the statute must be computed, not from the date of the execution of the power, but from the date of its creation. (1 R. S. 737, §§ 128, 129; *Thomson* v. *Livingston*, 4 Sandf. 539; *Cutting* v. *Cutting*, 86 N. Y. 522; *Schettler* v. *Smith*, 41 id. 328; *Manice* v. *Manice*, 43 id. 381, 382; *Hone* v. *Van Schaick*, 7 Paige's Ch. 231, 233; *Tyson* v. *Blake*, 22 N. Y. 558; *Taggart* v. *Murray*, 53 id. 233; *Jackson, ex dem. Nicoll,* v. *Brown*, 13 Wend. 437; *Hannan* v. *Osborn*, 4 Paige, 342; *Brudenell* v. *Elwes*, 1 East, 442; *Routledge* v. *Dorrill*, 2 Ves. Jr. 362; 1 Washburn on Real Prop., marg. p. 82, § 57; 1 R. S. 723, § 14; *Waldron* v. *Gianini*, 6 Hill, 604; *Pelletreau* v. *Jackson*, 11 Wend. 110; *Varick* v. *Waldron*, 13. id. 178; *Moffat* v. *Strong*, 10 Johns. 12; *Gilman* v. *Redington*, 24 N. Y. 16; *Edmons* v. *Cairns*, 3 Barb. 243–248; *Savage* v. *Burnham*, 17 N. Y. 572; *Moore* v. *Littell*, 41 id. 85, 86; *Sheridan* v. *House*, 4 Keyes, 569; *Hawley* v. *James*, 16 Wend. 120; *Edwards* v. *Varick*, 5 Denio, 664; *Pond* v. *Bergh*, 10 Paige, 140; *Nicoll* v. *N. Y. & E. R. R.*, 12 N. Y. 133, 134; *Pope* v. *Whitcomb*, 3 Russ. 124; 4 Kent's Com. 260; Fearne on Remainders, 551; *Hall* v. *Chaffee*, 14 N. H. 225; *Davidson* v. *De Freest*, 3 Sandf. Ch. 457; Lewis on Perpetuities, 532.) A limitation of an estate following an absolute gift of the same is repug-

nant and void where the first taker has also unlimited power to spend or dispose of the principal. (*Campbell* v. *Beaumont*, 91 N. Y. 465.) As to the personalty that came to Nathan from his mother, the accumulations on his share from the income of both realty and personalty were clearly his own and went to his next of kin on his decease. (*Reeben* v. *White*, 43 Barb. 97 ; *Davison* v. *De Freest*, 3 Sandf. Ch. 457–464 ; *Doe d. Hunt* v. *Moore*, 14 East, 601 ; *In re Peck's Trusts*, L. R., 16 Eq. 221 ; 42 L. J. Ch. 422 ; 21 W. R. 820.) The power in the ante-nuptial contract did not authorize a conditional limitation. (4 Kent's Com. 330 ; *Pawlet* v. *Pawlet*, 1 Wils. 224 ; *Butler* v. *Butler*, L. R., 7 Ireland, 401 ; *Little* v. *Bennett*, 5 Jones' Eq. 156 ; *Bristow* v. *Warde*, 2 Ves. Jr. 336 ; *Crompe* v. *Barrow*; 4 id. 685.) Mrs. Hotchkiss being an infant at the date of her marriage, her ante-nuptial contract was voidable at her election if not absolutely void. (*Bool* v. *Mix*, 17 Wend. 120 ; *Dearborn* v. *Eastman*, 4 N. H. 441 ; *Dominick* v. *Michael*, 4 Sandf. 421 ; *Clough* v. *Clough*, 5 Ves. Jr. 717 ; *Milner* v. *Ld. Harewood*, 18 id. 259 ; *Lucker* v. *Moreland*, 10 Peters, 73 ; *Walsh* v. *Powers*, 43 N. Y. 26 ; *Wallace* v. *Carpenter*, 11 Johns. 539 ; *Jackson, ex dem. Brayton*, v. *Beachin*, 14 id. 124 ; *McIlvaine* v. *Kadel*, 3 Rob. 429 ; 30 How. Pr. 193 ; *Meriam* v. *Harsen*, 4 Edw. Ch. 71 ; Broome's Leg. Max. 608 ; *Hunt* v. *Johnson*, 19 N. Y. 280 ; *Green* v. *Green*, 69 id. 556 ; *Ryder* v. *Hulse*, 24 id. 372 ; *Westervelt* v. *Gregg*, 12 id. 202.) A reasonable allowance should be made Leman B. Hotchkiss for money which he has expended for the past maintenance, education and support of his children during minority. (*In re Bostwick*, 4 Johns. Ch. 100 ; *Greenwell* v. *Greenwell*, 5 Ves. Jr. 194–199, and Sumner's note ; *Dawes* v. *Howard*, 4 Mass. 97 ; *Bruin* v. *Knott*, 1 Phillips, 574 ; *Harrung* v. *Coles*, 2 Brad. 349 ; *Borst* v. *Commie*, 19 Hun, 214 ; *Conant* v. *Stratton*, 107 Mass. 474 ; *Meacher* v. *Young*, 2 M. & K. 490 ; *Sesson* v. *Shaw*, 9 Ves. Jr. 285 ; *In re Hodges*, 7 Ch. Div. 754 ; *Freeman* v. *Coit*, 27 Hun, 447 ; *In re Howarth*, L. R., 8 Ch. 415 ; 21 W. R. 449 ; 42 L. J. Ch. 316 ; 28 L. T. [N. S.] 54 ; 1 Jarman on Wills [last ed.], 400 ; *Browne*

v. *Paull*, 1 Sim. [N. S.] 92 ; *Hadow* v. *Hadow*, 9 Sim. 438 ; *Leach* v. *Leach*, 13 id. 304; *In re Davison*, 6 Paige, 138 ; *Newport* v. *Cook*, 2 Ashmead [Penn.], 332.) Except in cases of the grossest malfeasance, as a punishment to a defaulting trustee, full legal interest is never allowed. ( *Williamson* v. *Williamson*, 6 Paige, 307 ; *King* v. *Talbot*, 40 N. Y. 96.)

*Peter B. Olney* for National Park Bank, defendant. Leman B. Hotchkiss became tenant by curtesy of all his wife's real property and entitled to the use of it during her natural life, and he succeeded to her personal property. (*Smith* v. *Colvin*, 17 Barb. 157 ; *Blood* v. *Humphrey*, id. 662 ; *Sleight* v. *Reed*, 18 id. 159; *Vartee* v. *Underwood*, id. 565 ; *Ryder* v. *Hulse*, 24 id. 372 ; *Hatfield* v. *Sneden*, 54 N. Y. 287 ; *In re Winnie*, 2 Lans. 21 ; *Barnes* v. *Underwood*, 47 N. Y. 351 ; *Burke* v. *Valentine*, 52 Barb. 412 ; 6 Alb. L. J. 167 ; *Rieber* v. *White*, 43 Barb. 97.) The will of Mrs. Hotchkiss was no more than simply an attempt to execute the power reserved to her by the ante-nuptial contract, and undertook to dispose of the property covered by that agreement, and no other property whatever. (*Blogge* v. *Miles*, 1 Story, 426, 446, 447; *White* v. *Hicks*, 33 N. Y. 392–394; *Wright* v. *Tallmadge*, 15 id. 307.) The absolute ownership of personal property can be suspended during the life of two persons in being at the date of the instrument containing the limitation or condition, etc., and no longer. (1 R. S. 773, §§ 1–2; *Shettler* v. *Smith*, 41 N. Y. 328; *Burrill* v. *Boardman*, 43 id. 259 ; *Hawley* v. *James*, 16 Wend. 63 ; *Manice* v. *Manice*, 43 N. Y. 374 ; 3 R. S. [6th ed.] 105, subd. 7.) Nathan's share of the real property also went to his father. (1 R. S. 75, § 1; 2 id. [6th ed.] 1133, § 1; 1 id. 727, § 44; *Purdy* v. *Hoyt*, 92 N. Y. 453; *Coster* v. *Lorillard*, 14 Wend. 342.) Section 16 of the Revised Statutes (1 R. S. 723) does not authorize such a succession of contingent remainders in real estate as is attempted to be created by the will. (*McSorley* v. *McSorley's Ex'rs*, 4 Sandf. Ch. 414; *Taylor* v. *Gould*, 10 Barb. 398; *Temple* v. *Hawley*, 1 Sandf. Ch. 153, 177, 178; *Thompson* v. *Carmichael's Ex'rs*, id.

396, 397; *Jennings* v. *Jennings*, 7 N. Y. 548; *Manice* v. *Manice*, 43 id. 378, 384; *Knox* v. *Jones*, 47 id. 398, 399.) Interest on each child's share should cease upon arrival at the age of twenty-one years, or within a short period thereafter, for the reason that after that period each child must be presumed to have known what the father was doing with the mother's estate, and what use he was making of its incomes, rents and profits. (*Walker* v. *Symonds*, 2 Swanst. 64; *Sherman* v. *Parish*, 53 N. Y. 492; *Ireland* v. *Ireland*, 84 id. 321, 322, 327–8; *Boughton* v. *Flint*,.74 id. 476; *Payne* v. *Gardner*, 29 id. 146; *Ireland* v. *Ireland*, 84 id. 321.) Each child should be charged a reasonable sum for its maintenance and support after each became of age. (*Wilks* v. *Rogers*, 6 Johns. 556; *Servaise* v. *Silk*, Cooper's Eq. 52; *Maberly* v. *Tarton*, 14 Ves. 499; *Cavendish* v. *Mercer*, 5 id. 194; *Sherwood* v. *Smith*, 6 id. 654; *Matter of Bostwick*, 4 Johns. Ch. 100; *Walker* v. *Rogers*, 6 Johns. 566; *Matter of Burke*, 4 Sandf. Ch. 617; *Matter of Kane*, 2 Barb. Ch. 375; *Hazard* v. *Rowe*, 11 Barb. 25; *Clark* v. *Montgomery*, 23 id. 472; *Cook* v. *Meeker*, 36 N. Y. 15.) By the will of Lucretia Hotchkiss only the property covered by the ante-nuptial contract passed to the devisees. (2 R. S., chap. 6, tit. 3, art. 3, § 79.)

EARL, J. On the 7th of June, 1879, Lemon B. Hotchkiss, being insolvent, made a general assignment to the plaintiffs for the benefit of his creditors. He preferred his three younger children, the defendants, William B., Fanney S. and Alice L. Hotchkiss, for the amounts justly due them on account of moneys and property of his wife, their mother, which he had received, as such amount should be found, after applying all just payments and offsets thereto, on a just and fair settlement; and he put the four bank defendants, from whom shortly before his assignment he had borrowed $55,000, into the fourth and last class of his creditors. The assignees having paid substantially all the debts of the assignor except the debts due to the children and to the banks, brought this action to determine the amounts due to the children; and the real

litigation has been between the children on the one side, and
the banks on the other.   The decision of the referee was gen-
erally favorable to the children, and they did not appeal to the
General Term.   The bank defendants appealed to the General
Term, and there the judgment entered upon the report of the
referee was modified, and as modified, affirmed.   Then the
children appealed to this court from the judgment of the
General Term, so far as it modified the judgment appealed
from unfavorably to them, and the bank defendants appealed
to this court from the judgment of the General Term, except
as to the modifications.

The claim of the children against their father arises out of
the following state of facts : In 1844 Lucretia Oakes being the
owner of certain real and personal property, and about to inter-
marry with Lemon B. Hotchkiss, entered into an ante-nuptial
contract with him, by which she conveyed and transferred to
Willard Wells all her real estate in trust, to receive the rents,
issues and profits thereof and apply the same to her sole and
separate use during her life.   The marriage took place May 1,
1884, and five children were born of the marriage, to-wit,
Thaddeus A., Nathan, and the three defendants.   It was pro-
vided in the ante-nuptial contract that Mrs. Hotchkiss might,
notwithstanding her coverture, give and devise the whole of
her property, covered by the ante-nuptial contract, to her hus-
band, or to her issue, or to any one or more of her issue, in such
shares and proportions as she should deem meet.   She died in
July, 1855, having in January of the same year executed a will
which, after reciting the ante-nuptial contract, by its date and
place of record, and that she had therein reserved the right and
privilege of giving and devising her real and personal estate
therein described and referred to, she made the following dis-
position of her property : "Now, therefore, I, the said Lucretia
Hotchkiss, do make, publish and declare this my last will and
testament in manner and form following — that is to say, first,
I give, devise and bequeath unto such child or children as I
shall leave or have living at the time of my decease, and to
their heirs and assigns forever, all my real and personal estate

of every name and nature and wheresoever situated, and more particularly described in the instrument herein above referred to, provided, nevertheless, that in case either or any of my children living at my decease shall die before he, she or they shall arrive at the age of twenty-one years, and without issue living at the decease of such child or children, the share or estate of the child or children so dying shall vest in and belong to, and I give and devise the same to the survivors or survivor of such deceased child or children ; and if such remainder cannot take effect it shall not defeat or destroy the estate given and intended to be given to my said children.   And I hereby commit the guardianship of all my children until they shall, respectively, obtain the age of twenty-one years unto the said Lemon B. Hotchkiss, my said husband, and give him the power to use, occupy and control as such guardian, for the use and benefit of my said children, all my real and personal estate devised and bequeathed to my children as aforesaid ; " and she nominated her husband sole executor of her will.

Mr. Wells, the trustee, died in 1856, and the son, Nathan, died in 1861, aged thirteen years.   The trustee never exercised any control over the property mentioned in the ante-nuptial contract, but during the life-time of Mrs. Hotchkiss it was occupied, controlled and used by her and her husband, and she annually executed to the trustee a receipt in full for the amounts she was entitled to under the ante-nuptial contract.   After her death Mr. Hotchkiss, acting as executor, took possession of the property devised and bequeathed by her will and occupied portions of the real estate himself at times, rented portions of it to other persons, used the personal property and the avails of the real estate in his own business, and in all respects managed and controlled the property at his discretion until the time he made the assignment to the plaintiffs.

The claim of the three children is for such use and enjoyment of the property after the death of their mother.   The bank defendants, however, claim that their father was entitled in his own right to substantially the whole of the property, or at least to the income thereof, and they make other objections

to the claims of the children which will be considered in this opinion.

(1.) At the time of the execution of the ante-nuptial contract Mrs. Hotchkiss was a minor, and hence it is claimed on behalf of the banks that the contract was voidable, and that it was disaffirmed and avoided by her and her husband after she reached her majority, and that, therefore, her husband's marital rights attached to the property. The referee was, however, justified upon the facts in finding that the contract was not disaffirmed. It was quite consistent with the contract that the trustee should permit the husband and wife to use, occupy and enjoy the property, the title to which was secured and protected by the contract. The annual receipts for the income of the property executed to the trustee, and the reference to the contract in the will of the wife, and the execution of the will in pursuance thereof, were all unequivocal acts of recognition of the contract, and were sufficient in law to show a ratification thereof. It may now be regarded as the settled doctrine that the contracts of an infant are not absolutely void, but only voidable. As to contracts purely executory it must be shown that the infant ratified them after he became of age before they can be enforced against him. As to contracts executed, such as deeds of land or conveyances of personal property, they will generally be deemed to be ratified, and will thus become just as valid and effectual as the contracts of an adult, unless they be disaffirmed by the infant before he arrives at age, or within a reasonable time thereafter. She did not disaffirm the contract in her life-time, and left it in full force at her death. Nor even if they could, did her husband or children disaffirm it after her death. There is no rule of law which will allow her husband's assignees or his creditors to disaffirm it. The defense of infancy is for the benefit and protection of infants, and other persons cannot set it up for their own benefit. (*Everson* v. *Carpenter*, 17 Wend. 419; *Taft* v. *Sergeant*, 18 Barb. 320; *Palmer* v. *Miller*, 25 id. 399; *Henry* v. *Root*, 33 N. Y. 526, 536, 543; *Walsh* v. *Powers*, 43 id. 23; *Chapin* v. *Shafer*, 49 id. 407; *Sparman* v. *Keim*, 83 id. 245.)

(2.) The referee held that the will of Mrs. Hotchkiss operated not only upon all the property embraced in the ante-nuptial contract, but also upon all the property owned by her at her decease.   In this respect the General Term modified his judgment, holding that the will operated only upon the property embraced in the ante-nuptial contract, and of this modification the three children now complain.   We think it is plain that the will was intended only as an execution of the power of disposition reserved in the contract.   She commences her will by referring to the contract, and to the fact that she had therein reserved the right and privilege of giving and devising her real and personal property, and then introduces the disposing clause by the words, "Now, therefore," thus showing that she makes her dispositions in pursuance and execution of the power reserved.   The general language, which would otherwise be sufficient to embrace all her property, is limited by the reference to the property "more particularly described" in the contract.   It is a general rule for the construction of all written instruments conveying property that, if a general clause be followed by special words limiting its scope, the instrument shall be construed according to the special matter.   But this rule is subordinate to the more general rule which requires that all instruments shall be so construed as to give effect to the intention of the parties.   Their intention, however, is to be derived from the language used in the instrument, interpreted with such helps as the law allows.   Here there is nothing in the will showing any intention on the part of Mrs. Hotchkiss to dispose of any property not embraced in the contract.   But taking all the language used, the intention simply to execute the power reserved in the contract is quite clear.   We have no means of knowing or even of conjecturing that she did not wish that her property not embraced in the contract should be left, to the disposition of the law.   In *Monk* v. *Mawdsley* (1 Sim. 286), where a married woman had the power of disposition of property by will under a marriage settlement, it was said :   "The introductory words in the will purport that the will is made only by force of the power, and every clause

in the will is, therefore, to be referred to the power." In *Conolly* v. *Vernon* (5 East, 51), the rule was well laid down, thus: "When there is a grant of a particular thing once sufficiently ascertained by some circumstance belonging to it, the addition of an allegation, mistaken or false, respecting it, will not frustrate the grant; but where a grant is in general terms, then the addition of a particular circumstance will operate by way of restriction and modification of such grant." (See, also, *Church* v. *Kemble*, 5 Sim. 525; *Parkin* v. *Parkin*, 5 Taunt. 321; *Ryall* v. *Bell*, 8 T. R. 579; *Holmes* v. *Hubbard*, 60 N. Y. 183.)

(3.) The General Term held (reversing the referee's judgment in that particular) that the limitation over in the will of Mrs. Hotchkiss, to the surviving brothers and sisters, upon the death of any of the children under the age of twenty-one without issue, was, so far as relates to personal property, void as in conflict with the statutes against perpetuities, and it is claimed on behalf of one of the banks, that the limitation over as to the real estate was also void. We are of opinion that the will does not offend against the statutes referred to. Upon the death of any child without living issue, the share of such child was given absolutely to the survivors, and vested absolutely in them, free from any other contingencies. Such is the plain language of the will. Upon the death of the mother the share of each child vested, subject to be defeated by death, without living issue, during minority.

As to the real estate, the limitation over created a contingent future estate in expectancy. Before the Revised Statutes the limitation would have been called an executory devise. Now it is more properly called a contingent remainder. Future estates are contingent "while the person to whom, or the event upon which they are limited to take effect, remains uncertain," (1 R. S. 723, § 13); and such estates are descendible, devisable and alienable in the same manner as estates in possession. (1 R. S. 725, § 35.) In the share given to each child, all the other children, therefore, had a contingent remainder which they could convey. (*Miller* v. *Emans*, 19 N. Y. 384; *Moore* v.

*Littel,* 41 id. 66; *Woodgate* v. *Fleet,* 44 id. 1; *Ham* v. *Van Orden,* 84 id. 257; *Mott* v. *Ackerman,* 92 id. 539, 549.) It is provided (1 R. S. 737, § 128) that "the period during which the absolute right of alienation may be suspended by any instrument in execution of a power shall be computed, not from the date of such instrument, but from the time of the creation of the power," and hence we must go back to the date of the ante-nuptial contract and see if, computing from that date, there has been an illegal suspension of the absolute power of alienation for a longer period than during the continuance of not more than two lives then in being. (1 R. S. 723, § 15.) The statute (§ 14) prescribes when the power of alienation shall be deemed suspended, and that is "when there are no persons in being by whom an absolute fee in possession can be conveyed." The ante-nuptial contract renders the real estate inalienable during the life of Mrs. Hotchkiss and no longer; but the will did not continue its inalienability for one moment. At her death all the persons were in being who could take the estate disposed of, and they took the whole of it. Nathan took a present vested estate in his share, and that he could convey, and the other children took a contingent remainder in the same share which they could convey, and even if there was any doubt about it at common law, under our present law they could all unite and convey an absolute fee in possession. Even if it were true as claimed on behalf of the banks, that the other children could not have conveyed their contingent interest to a stranger, it is admitted that they could release their interest to Nathan, and then he could have conveyed the whole estate. So, in any view, there were persons in being, at the death of Mrs. Hotchkiss, who could convey an absolute fee in possession to Nathan's share in the real estate, and hence there was no illegal suspension of the power of alienation in reference thereto.

I have treated this just as if all the children were adults at the death of their mother, as the statute is aimed only at the suspension of the power of alienation by the terms of the in-

strument, and not such as necessarily arises from the disability of infancy, or from other causes outside of the instrument.

I have also taken no account of the clause of the will committing the guardianship of the children to their father, as Mrs. Hotchkiss had no power to appoint any person such guardian, and hence that portion of the will is wholly inoperative, and so all parties seem to concede.

Most of the views thus expressed as to the real estate are pertinent as to the personal estate. The bequest of personal property to Nathan, with a limitation over in case he should die without issue during minority, was a valid limitation (*Tyson* v. *Blake*, 22 N. Y. 558), and it did not unduly suspend the absolute ownership of the property. (1 R. S. 773, § 1.) All the other children could have executed a valid release of their interest in such property to Nathan, and then he could have conveyed an absolute title thereto, or they could all have united and conveyed an absolute title to any one (1 R. S. 773, § 2; *Gott* v. *Cook*, 7 Paige, 521, 543); and hence, even if we assume that the personal property of Mrs. Hotchkiss passed to the trustee under the ante-nuptial contract, the absolute ownership of such property was suspended only during her life.

We do not deem it necessary to comment upon the numerous authorities to which the learned counsel for the banks have called our attention as bearing upon the questions just discussed. Many of them have no application to cases arising since the adoption of the Revised Statutes, and others are distinguishable by their circumstances. The case of *Manice* v. *Manice* (43 N. Y. 303), which is claimed to be an express authority for them, is not in point. In that case the testator created trusts of real and personal property to receive the income and apply it during the life of his widow, and upon her death to divide the property into shares; and as to the share of each daughter, to receive the income and apply it to her use during her life, and after her death to divide her part into as many shares as there should be children of such daughter living at the time of her death, and to retain one of such shares for each of said children, and accumulate the net income thereof

during his or her minority, and on his or her arrival at age, to pay the sum due to him or her with its accumulations, with contingent limitations over of the share of any such children who might die during minority. It was held that the contingent remainders, and the trust for accumulations, were valid as to real estate and void as to personalty — void as to personalty because the absolute ownership was suspended during two lives and a minority besides. RAPALLO, J., writing the opinion of the court, said : " The limitation over in·case of the death of a daughter's child during minority, suspends the absolute ownership of such daughter's share of the personal property beyond the lives of the widow and daughter, and during the minority of the daughter's children, if· she leaves infant children her surviving ; and we think the exception in section 16 (1 R. S. 723), which permits that suspension in case of real estate, is not applicable to personal property." It was not the limitation over in that case alone that created the mischief, but the fact that it was preceded by two lives during which the absolute ownership was suspended ; and so that case is circumstantially different from this.

We have so far proceeded upon the supposition that the personal property of Mrs. Hotchkiss was vested in her trustee under the ante-nuptial contract ; but there is much force in the claim made on behalf of the children that it was not. The real estate was plainly conveyed to the trustee, but the contract recognizes an agreement on the part of Mr. Hotchkiss that his wife's personal estate should be settled and assured to her sole and separate use during her life, with power on her part to dispose of the same by will, and then contains covenants on his part that he " will from time to time, and at all times hereafter, join and concur with the said Lucretia, his intended wife, in all such acts, deeds, assignments and assurances as in the law shall be deemed necessary for effectually settling, assigning and assuring all such personal estate as she, the said Lucretia, now is the owner of, or which, by reason of the premises before stated, she is or may be entitled to, unto him, the said Willard Wells, his executors and assigns, for

and upon the several trusts, intents and purposes, and subject to the power hereinbefore mentioned and intended to be reserved to the said Lucretia," etc. And among the powers reserved was one to dispose of the property by will. The personal estate was not granted or conveyed, but the parties seem to have contemplated that after marriage it might be, and the husband agreed to unite with her in making such conveyance at any time. No such conveyance was at any time made. Hence it is difficult to perceive how the trustee got any title to the personal estate. But by force of the agreement and covenants of the husband, founded upon the consideration of marriage, the title to the personal estate remained in her, free from the marital rights and control of her husband, and at her death passed to her children under her will, which she was authorized to make under chapter 375 of the Laws of 1849. The effect of his agreements and covenants, and of the marriage settlement, was a release of his marital rights in and to the personal property of his wife, which a court of equity will enforce. (*Bradish* v. *Gibbs*, 3 Johns. Ch. 523; *Wadhams* v. *Am. Missionary Society*, 12 N. Y. 415, 422.) In the latter case DENIO, J., says: "It may be proper to mention, to prevent misapprehension, that a formal conveyance to uses, or to trustees upon trusts to be executed by virtue of a power, is unnecessary; and that marriage articles, by which the husband agrees that his intended wife may dispose of her real estate, will be enforced in the same manner as though there had been a formal conveyance." Therefore Mr. Hotchkiss was precluded by his ante-nuptial contract from taking or claiming the personal property of his wife against her will. Hence, in any view of the case, whether the personal property of Mrs. Hotchkiss passed to her trustee or not, she made a valid and effectual disposition thereof by her will, and the General Term was in error in reference thereto.

(4.) The point is made on behalf of the children that the unexpended accumulated income of Nathan's share passed at his death, under the will of his mother, with the share itself, and, as incident thereto, to his brothers and sisters. As the

share was vested in Nathan during his life-time, the income thereof belonged absolutely to him, and we agree with the General Term that upon his death it passed to his father as his next of kin.

(5.) A still broader claim is made on behalf of the banks, and that is that the conditional limitation over, contained in the will of Mrs. Hotchkiss, was wholly unauthorized by the language of the ante-nuptial contract. That authorized her to give and devise her real estate to her children " in such shares and proportions as to her shall seem meet, such gift or devise to take effect, and the estate so given and devised to be in and by said will, to vest in the devisees therein named, as the same shall be to them given and devised." It directed her trustee, after her death, to pay over her personal property to her next of kin, or to the persons to whom she, by her last will and testament, should give and bequeath the same, and authorized her to give and bequeath the same to her children, " in such shares and proportions" as to her should seem meet. The claim is, that the authority to give and bequeath her property "in such shares and proportions as to her shall seem meet" did not authorize the conditional limitations over, but required her to allot the property in gross sums. The question to be answered is, what was meant by the language used in the ante-nuptial contract? She was then dealing with her own property, over which then she had absolute control. She secured to herself the entire income of the property during her life and the right to do with that as she willed, and she plainly intended to reserve the right to dispose of the entire property at her death, among her relatives, as she willed. She could distribute it in unequal proportions, and she could exclude some of her relatives entirely. She could give one a life estate, another an estate for years, and another a fee ; and still each one thus provided for would take a share and proportion. She could carve out of the property as many different estates as the law allows, giving to some life estates or conditional fees, and to others remainders, vested or contingent, and the property would be thus quite as effectually and really divided into shares as if

absolute physical division of the property were made among the objects of her bounty. There was no ·reason, and could not have been any purpose, to limit her power as claimed. We have carefully examined the authorities cited to uphold this claim, and it is sufficient to say that none of them support it, and it is impossible for me to conceive how there could be one. It is conceded that the great authority of Sugden on Powers (vol. 2, p. 294) is directly against this claim. The learned author says: " A power to appoint a fund in such *proportions* as a party shall think fit, implies that he may apportion it out in such manner as he pleases; consequently he may give one interest for life in a particular share to one child, or limit the capital of the same share to another, or even go so far as to limit to a third child upon a contingency, provided he doles out the whole in this various way among all the children only. The power does not require that he should distribute it in *gross* sums, and give each child an absolute interest in that gross sum, for such a power enables the gift of particular interests, and the appointment of such interests; and a general power to apportion lands receives the same construction; therefore life estates or rent charges may, in like manner, be given to any of the children."

(6.) The banks claim that the courts below should have made to Mr. Hotchkiss, in diminution of his liability to his children, a reasonable allowance for their maintenance, education and support, during their minority. He was of sufficient ability to support his children, and did support them from his own means, making no charge against them, and he now makes no charge; but his creditors seek to make it for him. A father is under a natural obligation to support his minor children, and, generally, if of sufficient ability, he is obliged to, without reference to their pecuniary circumstances. There is no doubt of the power of an equity court to make to a father a reasonable allowance for the past and future support of his minor children, out of their property, in his hands, or in the hands of their trustees. But such allowance is not made as matter of course. It depends upon the circumstances of each

case, and the interests of the children alone are considered. When the father ·is of sufficient ability to support his minor children, the circumstances would have to be very peculiar which would authorize or require the court to make the allowance. The rule is thus stated in Schouler on Domestic Relations at page 322: " As a general rule, the father must, if he can, maintain his infant children, whatever their circumstances may be, and no allowance will be made him for that purpose, out of their property, while his own means are adequate for their support. This principle is clearly established both in England and America." In *Ex parte Bond* (2 Mylne & K. 439), the master of the rolls said: " To allow for past maintenance, and to treat as a debt the expenditure which the law imposed upon the father as a duty, would be to act against the settled rule of the court." In the *Matter of Kane* (2 Barb. Ch. 375), the chancellor, referring to the case last cited, said: " To entitle the father, even to an inquiry as to the *propriety* of making an allowance for past support, he should state a special case, showing the extent of his means at the time such support was furnished, and the particulars of the extraordinary expenditure for the actual benefit of the infant which created an equitable claim in his favor." (See, also, *In re Hodges*, L. R., 7 Ch. Div. 754; *Carmichael* v. *Hughes*, 6 Eng. L. and Eq. 71; *Wilkes* v. *Rogers*, 6 Johns. 566; *In re Howarth*, L. R., 8 Ch. App. 415.) If the children were still minors, and the father was of insufficient means, and had become in debt or insolvent, by his efforts to support and educate his children, then there would have been a case, upon his petition, for a reasonable allowance to him out of their property, for both past and future support, that he might continue to furnish them a suitable home. But in such a case no court would make the allowance in order that the husband's creditors might sweep it away in such manner that the infants would in no way be benefited thereby. Here the infants have become of age, and the allowance would neither benefit them, nor their father. In such a case, we cannot say that the court below erred in refusing the allowance.

(7.) The court below committed no error in refusing to credit the father with the ordinary support and maintenance of his children in his home, after they came of age. They lived there as his children, not as boarders. They served him as children, not as hired servants ; and in such case neither can make any charge against the other. ( *Williams* v. *Hutchinson*, 3 N. Y. 312; *Carpenter* v. *Weller*, 15 Hun, 134; *Wilcox* v. *Wilcox*, 48 Barb. 327.) But we think there was enough in the case to justify the court below in crediting the father with certain extraordinary expenses incurred for his two daughters, Fannie and Alice, for their education, wardrobe and traveling expenses. The reasons given at the General Term for the allowances are satisfactory, and we do not feel disposed, under the circumstances, to disturb its conclusion.

(8.) The court below charged Mr. Hotchkiss the legal rate of interest on all sums of money for which he was held liable, without annual rests. We have carefully considered all that has been said in the briefs submitted to us against the charge, and are satisfied that it is proper, for reasons stated in the opinion at General Term.

We have now paid attention to the principal matters brought under our consideration by these appeals. The case is one of great complexity and confusion, and a new trial, if one could be granted, might not, and probably would not, produce juster results. With the exception of the single error into which the General Term fell, we see no reason to interfere with the judgment.

Our conclusion, therefore, is that the judgment of the General Term, so far as it modifies the judgment of the referee by holding that the share of the deceased son, Nathan, in the personal estate, bequeathed by his mother, belonged, at his death, to his father, and was not, therefore, properly chargeable to him, should be reversed, and, in other respects, the judgment should be affirmed, without costs to any of the parties in this court ; and, as both parties claim that there are clerical errors in the judgment of the General Term, as settled, this decision

is without prejudice to the rights of any party to apply to the Supreme Court for the correction of such errors.

All concur.

Judgment accordingly.