In the Matter of the Estate of WILLIAM CARROLL, Deceased.

Surrogate's Court, New York County, November 27, 1934.

*Tibbetts, Lewis, Lazo & Rand* [*Harland B. Tibbetts* of counsel], for the respondents Grace Carroll and another as trustees, etc., of William Carroll.

*Griffiths & Content* [*Charles H. Griffiths, Jacob Schild* and *William Russell Bogert* of counsel], for the petitioner.

*Daniel J. Mooney,* for Ralph C. Carroll.

*Phillips, Mahoney, Leibell & Fielding* [*Jeremiah T. Mahoney, Vincent L. Leibell* and *Joseph W. McGovern* of counsel], for Paul Allan Curtis.

*Benjamin F. Schreiber,* special guardian.

FOLEY, S. This is a construction proceeding in which the validity of the exercise of a power of appointment created by the testator's will is presented for determination.

Numerous and complicated questions have arisen. At least two of them involve the determination of novel problems concerning which the research of counsel and of the surrogate have failed to reveal any direct pertinent decisions by the courts of this State. The various attorneys for the parties have submitted comprehensive briefs which have reviewed these questions with commendable thoroughness. One phase of the proceeding has been made needlessly complicated. It involved the application of section 347 of the Civil Practice Act to the testimony of certain witnesses. Rehearings were applied for and granted. The parties were plainly engaged in maneuvers for technical advantage upon the competency of the testimony.

The testator died on November 2, 1910, leaving a will dated October 15, 1902. Under the fourth paragraph thereof he left his residuary estate in trust for the life of his wife, Grace Carroll. Under the fifth paragraph he directed that, upon the death of his wife, the estate theretofore held in trust for her life should be held in further

trusts, one-half for the benefit of his daughter, Elsa Milliken, with income to her during her life, and the other half for the benefit of his son, Ralph, with income to him during his life. He further directed that the share held for the benefit of his daughter should be subject to a power of appointment by her will. He specifically gave to her " power by last Will and Testament, notwithstanding coverture, to dispose of the share or property so set apart for her use to and among her children or any other kindred who shall survive her and in such shares and manner as she shall think proper." In the absence of a valid disposition by his daughter, under the power, he provided that upon her decease, " the share so set apart or held for her use during her life will go and belong, and I accordingly give the same to her then surviving child or children, descendant or descendants, the children taking equal shares, and the descendants of any deceased child taking the share which would have belonged to their parents, if living, and if there be no child or descendant of said daughter who shall survive her, then the shares so set apart for the use of my said daughter shall, on her decease, go and belong, and I accordingly give the same to my surviving heirs or next of kin, according to the nature of the estate."

The widow of the testator is still living. His daughter, Elsa, however, died on June 26, 1933. She left no child or descendant. The value of the share of the trust fund over which she was given the power of appointment was originally estimated to be $750,000. That amount has been reduced by shrinkage in the value of the investments. By her will, dated October 13, 1931, she exercised, by specific reference, the power of appointment reserved to her under her father's will. By subdivision (a) of the second paragraph of her will she gave out of the appointive fund to her brother, Ralph, the sum of $5,000. By subdivision (b) she gave to her cousin, Paul Allan Curtis, the sum of $250,000. There was a contingent gift over in the event of her cousin's death which is not material here because he survived the donee. By subdivision (c) of that paragraph she gave the residue of the share of the estate of her father, held in trust for her benefit, to her executors, in trust, for the following purposes: " To divide the said residue into as many equal shares as my brother, Ralph C. Carroll, shall have children me surviving; separately to invest and reinvest each of said equal shares, manage and care for the same, and to collect the rents, issues, income and profits of each of said shares; and, out of the net income of each of said shares, to apply such sums to the use, maintenance, education and support of the respective ' cestui que trust ' as my said Executors and Trustees may deem necessary and proper; and to accumulate the residue of such net income of each of said shares until the

respective ' *cestui que trust* ' shall attain the age of twenty-one years; and, upon any of such children attaining the age of twenty-one years, to pay to such child the share so held in trust for him or her, together with any and all undrawn accumulations of income thereon."

The death of the testator's daughter, Elsa — the donee — has raised the following questions of construction respecting the validity of the exercise by her of the power of appointment and the dispositions thereunder made in her will:

(1) Did the death of Elsa prior to that of the primary life tenant affect her right to exercise the power?

(2) Were Elsa's cousin, Paul Allan Curtis, and the children of her brother, Ralph, proper objects of the power of appointment under paragraph fifth of the donor's will, and particularly under the limitation upon the exercise of the power to appoint to her " kindred?" Did the provisions of the will restrict Elsa to appoint to her next of kin and thereby was the appointment to the children of her brother, Ralph, and to her cousin, void because of the fact that her sole next of kin was her brother, Ralph?

(3) If the children of Ralph were proper objects of the power, was there a violation of our statutes against perpetuities in so far as the donee of the power created equal trusts of the residue of the appointive property for the benefit of the children of her brother, Ralph, until they respectively attained majority? Was there an illegal suspension for a third life, or a trust for the benefit of persons not in existence at the death of the donor?

(4) If Paul Allan Curtis was a proper object of the power, did his agreement with the donee, evidenced by a certain letter dated October 13, 1931, in which he agreed to pay to the donee's husband the sum of $100,000 in consideration of the bequest of $250,000 to him under the donee's will, affect the validity of the exercise of the power? Was such agreement in fraud of the power? Was the exercise of the power rendered thereby void either (a) wholly, or (b) partially to the extent of the promised gift to the donee's husband?

(1) In answer to the first question, I hold that the donee of the power, Elsa, having survived the donor of the power, her right to exercise the power of appointment vested in her at his death, and was not affected by her death prior to that of the primary life tenant. (*Matter of Hayman*, 134 Misc. 803; affd., 229 App. Div. 853; affd., 256 N. Y. 557; *Matter of Wilcox*, 194 id. 288; *Duff* v. *Rodenkirchen*, 110 Misc. 575.)

(2) The answer to the second question depends upon the interpretation of the testator's use of the word " kindred " in paragraph fifth of his will. If by " kindred " he intended " next of kin,"

then the appointment of $250,000 of his estate by the donee to her cousin, Paul Allan Curtis, and the residue to the children of her brother, Ralph, was invalid and ineffective. In such case the entire appointive fund passed under the provisions of the donor's will to her brother, Ralph, as the sole surviving next of kin of the donor. On the other hand, if " kindred " meant " relatives " or " relations of the blood " in a general sense, then the donee's cousin and the children of Ralph, nephews of the donee, are within the class of proper appointees.

No reported case has been found in this State which discloses the use of the word " kindred " as the designation of a group as the objects of a power of appointment.

Care and accuracy in the choice and use of legal terms emphatically pervades the entire will of the testator. It is evident that the draftsman was a skilled and experienced specialist in the law of wills and estates. The employment of the words " children," " descendants," " heirs " and " next of kin " plainly indicate a comprehensive understanding of the various legal distinctions of the terms employed. The testator reserved to Elsa the power to appoint " to and among her children or any other kindred who shall survive her and in such shares and manner as she shall think proper." If the testator intended by the word " kindred " to limit the appointees to the " next of kin " of the donee, he would have used the latter term. He has indicated by apt language that he was aware of the significance of the words " next of kin " as used in wills. He provided for a distribution to " next of kin " in the event of the absence of a valid exercise of the power by the donee. In such case, he directed that the share set apart for the donee's use during her life shall go upon her death " to her then surviving child or children, descendant or descendants, the children taking equal shares, and the descendants of any deceased child taking the share which would have belonged to their parents, if living." It is thus evident that he knew that her surviving children and the children of deceased children, if any, could be, in the legal sense, her only next of kin. The further provision that " if there be no child or descendant of said daughter who shall survive her, then the share so set apart for the use of my said daughter shall, on her decease go and belong, and I accordingly give the same to my surviving heirs or next of kin, according to the nature of the estate," is further evidence of his intimate knowledge of the technical legal use and distinction between the import of the words " next of kin " and " heirs." Particularly is this shown by the employment of the words " according to the nature of the estate," by which was intended that the personal property was to go to his next of kin and

the real property to his heirs at law. Further light upon the testator's intention and the purposeful employment of carefully chosen words may be obtained from the provisions for the benefit of his son, Ralph, and the power of appointment reserved to him thereunder. Under paragraph fifth of the will Ralph was given a power to appoint " to and among his kindred or wife." Here again there is observable careful draftsmanship. The husband of Elsa was not permitted to participate. The wife of Ralph was specifically mentioned as a possible object of appointment. If " kindred " in the case of Ralph meant " next of kin," he may appoint, either to his next of kin or to his wife, by alternative disposition. There can be no doubt that under that language Ralph may appoint wholly to kindred or wholly to his wife, or in part to kindred and in part to his wife. Clearly, the power to appoint to his wife is, in the case of Ralph, not subordinate nor conditioned upon the failure of kindred. The word " or " is used both in the conjunctive and the disjunctive sense as if the modern " and/or " had been used. Similarly, under the provisions for Elsa she could appoint either to her children or to " any other kindred." The appointment to " any other kindred " was not substitutional and did not depend upon the failure of issue. If, in using the word " kindred," the testator meant " next of kin," the donee would have had no alternative but to appoint to her children, if any, since they would be the only persons who, under the law, would constitute her " next of kin." The words " any other kindred " in that event would be superfluous. In the search for intent, the statement of Mr. Surrogate WINGATE in *Matter of Corlies* (150 Misc. 596) is applicable here: " When a testator has, in one part of his will, demonstrated his ability of making a certain variety of gift in apt terms, the use of a variant mode of expression in another direction will give rise to an inference that he had a diverse disposition in view. (*Matter of Wells*, 113 N. Y. 396, 402; *Matter of Goldmark*, 186 App. Div. 447, 451; *Matter of Voight*, 178 id. 751, 755; *Matter of Hallet*, 8 Paige, 375, 378.)" In my opinion, the testator did not intend to use the word " kindred " in its strict and primary legal signification of " next of kin," but in the broader and more comprehensive meaning of relatives or relations of the blood, as commonly understood and generally defined by the authorities. In Corpus Juris, the definition of " kindred " is as follows: " A relation by birth or consanguinity; next of kin; relations by blood; relatives by blood. One's kindred, in the proper signification of the word, means only such persons as are related by blood, and does not include relatives by marriage. * * * One's kindred are divided, and include collateral and lineal relations; they are descendants, ascendants, or collaterals."

(35 C. J. 914.) Bouvier's Law Dictionary (Baldwin's Century ed.) defines " kindred " in substantially similar language. " Kindred " may be held to be the equivalent of and have the same meaning as the word " relations." " Relations " is defined by Jarman in his Treatise on Wills as follows: " The word *relations* taken in its widest extent embraces an almost illimitable range of objects; for it comprehends persons of every degree of consanguinity, however remote." (3 Jarman Wills [7th ed.], p. 1601.) In the examination of the English and American cases there is a clearly discernible difference in the construction of the words " kindred," " relatives," " relations " or " nearest relations " (a) in a group designated by the donor as possible objects of the appointment, and (b) in bequests or devises contained in a will which contains no power or in alternative bequests or devises in default of the exercise of a power. The reason for this distinction is clear. Where the class of possible appointees is designated, the exercise of the power of selection within the indicated group fixes definitely the persons intended to take under the donee's will. Where the bequest or devise, however, is direct, and is contained in a will containing no power, or in the donor's will, in default of the power, the employment of the words " kindred," " relatives," " relations " or " nearest relations " necessarily tends to indefiniteness. The element of certainty is lacking on the face of the will, but by judicial construction that defect is supplied by the imputation of an intent to confine the bequest or devise to the class of persons within the legal description of next of kin or heirs at law. (See 3 Jarman Wills [7th ed.], p. 1607, and the English cases cited therein; *Farmers' Loan & Trust Co.* v. *Polk*, 166 App. Div. 43.) There are modifications of this rule in isolated cases where other provisions of the will or extrinsic evidence may indicate a different construction. (*Matter of Martin*, 255 N. Y. 248.)

The donee here clearly had a power of selection as to the kindred to whom she could appoint, and from the general context of the will such power was not limited to next of kin, but comprehended every person of every degree of consanguinity to the donee.

I hold, therefore, that her cousin, Paul Allan Curtis, and her nephews, the children of her brother, Ralph, were embraced within the class of persons to whom, under the terms of the donor's will, she could validly appoint.

(3) I am of the opinion that the appointment to the children of the donee's brother, Ralph, of the residue of the estate did not violate our statute against perpetuities (Real Prop. Law, § 42, and Pers. Prop. Law, § 11). The contention that an illegal third life had been added by the donee's will to the two lives through which

the fund might pass under the donor's will, must be overruled. The further contention that the gifts are unlawful because the children of Ralph were not in existence at the date of the donor's death is overruled. The remainders vested in equal shares in the children of Ralph who survived the donee of the power. Vesting in title was not postponed beyond the second life. The donee directed that the residue be divided " into as many equal shares as my brother, Ralph C. Carroll, shall have children me surviving." The number of shares, therefore, became fixed and determined upon the donee's death. There was no gift over in the case of the death of the infant during minority. There was no illegal suspension. Possession and enjoyment only were postponed until each child attained the age of twenty-one years. Under the provisions of the donee's will, her executors are, in effect, donees of a power in trust with the right to control and manage the funds during the minorities of the infants. The situation here is similar to that which arose in *Matter of Trevor* (239 N. Y. 6). There the interests of the infants were held to have belonged to and to have vested in title in the issue of a child of the testator within the statutory period. The court observed that the testator " postpones the right of possession, if the issue are infants, by providing that such shares shall remain in the custody of the executors, and it may well be said for the sake of consistency and in order, if possible, to vest an estate, that the interest of the minors vests absolutely at the end of the second life. In other words, he directs when their vested interest shall be given to them; when they shall come into free and unrestricted possession of their shares. Nothing is interposed between the beneficiaries and their enjoyment of their estate except the provisions of the will as to the time of such free and unrestricted possession of their shares (*Van Brunt* v. *Van Brunt*, 111 N. Y. 178, 187). The suspension of the full power to alienate during minority results from the disability of infancy. The statute is aimed only at suspension by the terms of the will (*Beardsley* v. *Hotchkiss*, 96 N. Y. 201, 214)."

The gifts to the children of Ralph, therefore, having vested in time upon the death of the donee of the power, are valid and not in violation of our statutes against perpetuities. (*Fulton Trust Co.* v. *Phillips*, 218 N. Y. 573.) In this respect the will here differs from those construed in the cases which have read into the will of the donor the postponements under the will of the donee and have found illegality because of the unlawful suspension of the power of alienation. (*Fargo* v. *Squiers*, 154 N. Y. 250; *Ripley* v. *Guaranty Trust Co.*, 165 App. Div. 481; Hon. Robert McC. Marsh on " Perpetuities Arising Through Powers of Appointment," Columbia Law Review, vol. XXV, No. 5, p. 521.)

(4) In answer to the questions contained in the fourth group, I am of the opinion that the bequest to Paul Allan Curtis, the cousin of Elsa Milliken, was vitiated by his agreement to pay to the donee's husband the sum of $100,000 in consideration of the bequest to him under the donee's will. The entire bequest is void. This agreement was evidenced by a letter addressed to Mrs. Milliken, the donee, signed by Paul Allan Curtis, which was dated and signed upon the very day of the execution of the will which exercised the power of appointment. The letter reads as follows:

" DEAR ELSA: I am informed that by your last Will and Testament you have given and bequeathed to me the sum of Two hundred and fifty thousand ($250,000.00) Dollars.

" In the event that you should predecease me and I should receive the bequest aforementioned, I hereby promise and agree, in consideration of the said bequest, that I will pay to your husband, Foster Milliken, Jr., the sum of One hundred thousand ($100,000.00) Dollars out of the said bequest which you have given to me by your said Will.

" Affectionately,<br>
" PAUL ALLAN CURTIS."

Oral testimony was submitted upon this phase of the case. It consisted of the evidence of Harold A. Content, one of the executors under Mrs. Milliken's will and the draftsman of that will and of the letter signed by Curtis, and the testimony of a Mrs. Elliott, a friend of Mrs. Milliken. There was also submitted the evidence of Paul Allan Curtis. Objection was made to the testimony of the witnesses Content and Curtis upon the ground that they were incompetent to testify to personal transactions with Mrs. Milliken under the prohibition contained in section 347 of the Civil Practice Act. Mr. Content was originally called as a witness for the trustees of the donor's will. Upon the subsequent rehearing it was attempted to render his testimony competent by having the records show that he was called as a witness by the executors of the estate of the donee.

After careful consideration of the provisions of section 347 of the Civil Practice Act and the authorities which have construed it, I have decided to permit the testimony to remain in the record as competent and I accordingly deny the motion to strike it out. The question is a novel one in the law of evidence in this State. No reported decision has been disclosed which directly determined that a person financially interested in the outcome of litigation may or may not testify to personal transactions with the donee of a power of appointment. In my ruling, however, I am persuaded to follow the strong dictum of the Court of Appeals in *Ward* v.

*N. Y. Life Ins. Co.* (225 N. Y. 314). That case involved the competency of a person, the wife of the decedent, to testify to personal transactions with her husband, for the purpose of establishing the alleged assignment to her of the insurance policy. The sons of the decedent had been duly designated by the decedent as beneficiaries and the insurance company recognized them as such. Section 829 of the Code of Civil Procedure was the pertinent statute. Its context was similar to present section 347 of the Civil Practice Act. Chief Judge HISCOCK, writing for the court and upholding the competency of the evidence of the widow as against the sons (the beneficiaries under the policy), pointed out that the beneficiaries did not derive their " title or interest from, through or under a deceased person * * * by assignment or otherwise." In effect the claim was directly against the insurance company and the proceeds of the insurance came into existence at the death of the insured. He said: " The great body of authority makes it plain, by inference at least, that when section 829 speaks of deriving title or interest from, through or under a deceased person it contemplates property or an interest which belonged to the deceased in his lifetime and the title to which has passed by assignment or otherwise through him to the party who is protected by the section. These authorities do not contemplate a case where a party claims property from a third person which never belonged to the deceased and which in fact did not come into existence until his death." In that decision comparison of the nature of an interest of a decedent in an insurance policy was made with the exercise of a power of appointment possessed by a donee. Judge CULLEN's decision in *Matter of Dows* (167 N. Y. 227, 231) was referred to, in its description of the donee's interest, where he said: " But whatever be the technical source of title of a grantee under a power of appointment, it cannot be denied that in reality and substance it is the execution of the power that gives to the grantee the property passing under it." Judge HISCOCK concludes that despite this interest of the donee, " it has been held that the title of a grantee under a power of appointment comes from the donor of the power rather than from the one who exercises it. (*Chanler* v. *Kelsey*, 205 U. S. 466, 474.)" Analogy was, therefore, drawn by him to the similarity arising under an insurance policy where the title or interest was derived not from the decedent but from the insurance company.

The rule may be stated in a different way, therefore, that no person interested in the event is competent to testify to personal transactions with the *donor*. Any person interested in the event is competent to testify to personal transactions with the *donee*. Although the language of section 347 appears to sustain these con-

clusions, the disadvantageous results of such a rule of evidence require comment. Whatever may be the source of the power, it is the testamentary act of the donee, in the form of a will, which makes the final disposition of the appointed fund effective. For some purposes the " execution of the power is considered the source of the title." (*Chanler* v. *Kelsey*, 205 U. S. 466; *Matter of Canda*, 197 App. Div. 597, 609.) The donee has been variously described in the applicable decisions as the agent, *alter ego*, trustee or quasi-trustee of the donor. It has been the experience of the surrogates that section 347 is in great measure a desirable shield provided by the law to prevent the establishment of unjust claims against estates. Attempts have been made to alter its provisions and some criticism has been directed to the rule of preclusion, but the great body of mature thought and the observation of its practical application justify its continuance. In many cases the will of a person who has been given a power of appointment not only exercises the power, but in addition makes distribution in the same instrument of the individual property of the donee. An inconsistent situation which deserves no toleration in a system of probate of wills will result. Legatees named in the testamentary instrument, next of kin or other persons interested in the individual property of the donee will be prohibited from testifying as to personal transactions of the decedent in a probate contest arising over the validity of the will. The very same persons would be entitled to testify in their own behalf to personal transactions tending to prove the validity or invalidity of the instrument as an exercise of the power of appointment.

An experienced surrogate conducting the trial might, with a trained power of analysis, be able in such a situation to determine from the two separate lines of testimony involved in the same proceeding, whether the alleged will was valid as an exercise of the power or valid as a disposition of the property personally owned by the decedent. To a jury the submission of testimony incompetent on one issue and competent on the other would be confusing and the result would be almost impossible of solution. Inevitably two separate trials would be required and in closely balanced cases, contrary results, either rejecting the will or admitting it, would be possible. With this incongruous result, it would appear that section 347 of the Civil Practice Act should be amended by the Legislature so as to preclude the testimony of interested persons as to personal transactions with the donee of a power, either in the contested probate proceeding or in a proceeding similar to that pending here.

The subordinate contention raised by certain of the parties upon the hearing that the testimony of either Mr. Content, the executor, or Mr. Curtis, the beneficiary, is incompetent because of the possible

imposition of costs against them, or the award of costs to them (*Crocker* v. *N. Y. Trust Co.*, 245 N. Y. 17; *Matter of McCulloch*, 263 id. 408) must also be overruled. Since section 347 of the Civil Practice Act, as I have construed it, does not prevent the giving of the testimony of conversations or transactions with the donee, the possible allowance or disallowance of costs is immaterial.

It has been established from the evidence, and particularly from the letter dated October 13, 1931, signed by Paul Allan Curtis, that the making of the bequest out of the appointed property to the latter was based upon his agreement to pay to the husband of the donee the sum of $100,000. The limitations on the exercise of the power contained in the will of the donor clearly excluded Mrs. Milliken's husband from any participation in the fund. Under my interpretation of the word " kindred " the objects of the appointment were limited to relations of the blood of the donee. The husband could not take under the terms of the donor's will. Even if the testimony of Mr. Content and Mr. Curtis was held to be incompetent to establish the making of the agreement, nevertheless, the letter of October 13, 1931, and the testimony of Mrs. Elliot, would be sufficient to prove the agreement between Mrs. Milliken and Mr. Curtis which was intended to benefit a person not an object of the power under the donor's will. The letter was concededly signed by Mr. Curtis. The agreement is unenforcible and void. (*Farmers' Loan & Trust Co.* v. *Mortimer*, 219 N. Y. 290.) " It is not, I apprehend, to be doubted that equity * * * will never uphold an act which will defeat what the person creating the power has declared, by expression or necessary implication, to be a material part of his intention." (*Cooper* v. *Martin*, L. R. [3 Ch. App.] 47, 58; *Matter of Parkin*, L. R. [3 Ch. 1892] 510, 517.)

In *Farmers' Loan & Trust Co.* v. *Mortimer* (219 N. Y. 290) the will of the donor provided that the appointment could be exercised only by the will of the donee. The donee borrowed $5,000 from a finance company. It attempted to secure the loan by a contract with the donee to bequeath to the company the sum of $25,000. He executed an irrevocable will to effectuate the contract. His last will revoked the so-called irrevocable will. It appointed the fund to his relatives. The contract to make the will in favor of the finance company was held to be equivalent to the execution of the power by a deed, which was unauthorized by the donor, and the contract was held void and unenforcible. It would have nullified the will of the donor. (See, also, *Central Trust Co.* v. *Dewey*, 179 App. Div. 112; affd., 223 N. Y. 726.)

In the present proceeding the agreement is unquestionably void to the extent of the sum promised to be paid to the husband of the

donee. I am also of the opinion that the promise so vitiated and permeated the bequest to Paul Allan Curtis that the appointment of the entire sum of $250,000 is a fraud upon the power. No reported case in this State has construed this exact situation. The English courts have held that where there was a secret agreement for an improper diversion of part of the appointed fund, then the whole gift fails. (*Matter of Marsden's Trust*, 4 Drewry, 594; 62 Eng. Rep. 228; *Birley* v. *Birley*, 25 Beav. 299; 53 Eng. Rep. 651; *Pryor* v. *Pryor*, 2 De G., J. & S. 205; *Portland* v. *Topham*, 11 Clark's H. L. Cas. 32; *Topham* v. *Portland*, L. R. 5 Ch. App. 40; Bispham Principles of Equity [6th ed.], p. 364.) In *Portland* v. *Topham* (11 Clark's H. L. Cas. 32), known as the " Duke of Portland's Case," the appointment was to a person entitled to take under the will of the donor. However, under an agreement with her, one-half of the fund was to be hers outright, and the other half was to be set aside and the income accumulated for the purpose of preventing an outright payment to another sister who was a person within the authorized objects of the power. The motive behind the agreement was an attempt to restrain the latter's marriage. Lord WESTBURY, then Lord Chancellor, said: " I think we must all feel that the settled principles of the law upon this subject must be upheld, namely, that the donee, the appointor under the power, shall, at the time of the exercise of that power, and for any purpose for which it is used, act with good faith and sincerity, and with an entire and single view to the real purpose and object of the power, and not for the purpose of accomplishing or carrying into effect any bye or sinister object (I mean sinister in the sense of its being beyond the purpose and intent of the power) which he may desire to effect in the exercise of the power. I think it would be endangering the whole of the established principles of our law upon this subject if we were to permit a transaction of this kind to stand, or to hold that it is a transaction which can be reconciled with the faithful, sincere, just and honest exercise of the power committed to the appointor, and which he is to exercise as a trustee." In the same case Lord ST. LEONARDS said: " A party having a power like this must fairly and honestly execute it without having any ulterior object to be accomplished. He cannot carry into execution any indirect object, or acquire any benefit for himself, directly or indirectly." He observed that the transaction was founded upon an intention to give one-half and no more to the designated appointee, and to make her the instrument of tying up the other half for her sister. The whole appointment was nullified by the court. " If not good for the moiety, which it is not, then it cannot be good for the other part; for the other

part is given to the appointee who is to execute that purpose, which, of itself, destroys the whole appointment."

It is impossible in the present case to separate the valid from the invalid disposition. The "bargain behind," as it is called in the authorities, is inseparably connected with the whole bequest. It is argued that we may sever the bad in the appointment from the good and save the bequest to Curtis to the extent of $150,000. It is urged that regardless of the agreement for the benefit of the husband, the donee intended to benefit Curtis to this limited amount. In my opinion it is impossible to divide the bequest and to treat the benefits to Curtis and to Mr. Milliken as independent of each other. The bequest and agreement are so commingled as to be part of one entire design which is in violation of the objects of the donor's will. The letter signed by Curtis on the day of the execution of Mrs. Milliken's will specifically recited that " *in consideration of the bequest* " of $250,000 he would pay out of such bequest the specified amount to the husband. This provision and consideration tainted every part of the appointment. The whole bequest was in explicit terms made the consideration for the diversion of part of it.

Cases may arise where under our policy of salvage of the valid parts of a will, a part of the appointment may be saved. Thus in the absence of a fraudulent agreement, where on the face of a will the appointment was to children of the donee and a condition was attached to the gift that would permit participation by a stranger, a severance might be justified, especially where the children of the donee would not take in default of the valid exercise of the power. (Bispham Principles of Equity [6th ed.], p. 367.) That situation is not here.

The decisions dealing with the entire or partial invalidity of the exercise of the appointment are divided into two groups, (a) where the diversion to an unauthorized person appears upon the face of the will, in most cases attached by a condition to the gift, and (b) where the diversion is the subject of a secret agreement between the parties. In the great majority of cases the appointment has been declared to be wholly void. It may be safely stated with respect to secret agreements, that in the leading cases, without exception, total invalidity has been found. The case of *Chenoweth* v. *Bullitt* (224 Ky. 698; 6 S. W. [2d] 1061) is a well-reasoned and thorough opinion where the will of the donee itself contained the condition. The class of appointees in that case was limited to " lineal heirs." The donee of the power in his will devised the property to a lineal heir but upon the condition that the latter should pay off certain indebtedness of the donee and should pay the donee's wife a certain amount annually during her life. The creditors and wife were

excluded from any participation by the terms of the donor's will. The appointment was held to be " fraudulent and void, fraudulent, in the technical sense, of course, being made for a purpose foreign to the power," and thereby completely invalid.

The English cases of *Viant* v. *Cooper* (76 L. T. R. 768) and *Ranking* v. *Barnes* (33 L. J. Ch. 539), submitted in support of the contentions of Paul Allan Curtis, are not applicable to the present situation. In neither of these cases was there a " bargain behind " made by the donee with the appointee, nor was knowledge of the illegal precatory request or condition possessed by the latter. Illegality in those decisions appeared upon the face of the instruments. The courts in those cases were able to clearly separate the proper objects of the powers from purposes or appointees other than those for which they were created.

In conclusion, I hold that the bequest in the second paragraph of Mrs. Milliken's will, whereby she gave out of the appointed fund to her brother Ralph the sum of $5,000, is valid. The bequest to Paul Allan Curtis of $250,000 being wholly void, fell into and became part of the specific residue dealing with the appointed fund. (*McLean* v. *McLean*, 174 App. Div. 152; affd., 223 N. Y. 695; *Wright* v. *Wright*, 225 id. 329.) The invalid prior bequests passed under the residuary clause. The doctrine has been well established that " where the residuary bequest is not circumscribed by clear expressions in the instrument and the title of the residuary legatee is not narrowed by special words of unmistakable import, he will take whatever may fall into the residue, whether by lapse, invalid dispositions, or other accident." (*Matter of Cole*, 235 N. Y. 48, 56.) All of the fund subject to the power of appointment, with the exception of the foregoing sum of $5,000, becomes, therefore, payable to the executors of Mrs. Milliken's estate to be divided into five equal parts. These shares must be held under the terms of Mrs. Milliken's will as the absolute property of each of the five sons of Ralph C. Carroll, with payment to be made to each of them upon the attainment of his majority.

Submit decree on notice construing the will accordingly.