In the Matter of the Petition of HAROLD A. CONTENT, as One of the Executors, etc., of ELSA C. MILLIKEN, Deceased, for a Construction of the Last Will and Testament of WILLIAM CARROLL, Deceased.*

PAUL ALLAN CURTIS and RALPH C. CARROLL, Appellants; GRACE CARROLL and Another, as Trustees, and Others, Respondents.

First Department, March 13, 1936.

* Modfg. and affg. 153 Misc. 649.

*Jeremiah T. Mahoney* of counsel [*Joseph W. McGovern* with him on the brief; *Phillips, Mahoney, Leibell & Fielding,* attorneys], for the appellant Paul Allan Curtis.

*Daniel J. Mooney* of counsel [*Abel I. Smith* and *Floyd D. Frost* with him on the brief], for the appellant Ralph C. Carroll.

*Harland B. Tibbetts* of counsel [*Charles G. Thompson* with him on the brief; *Tibbetts, Lewis, Lazo & Rand,* attorneys], for the respondents Grace Carroll and Central Hanover Bank and Trust Company, as trustees.

*Benjamin F. Schreiber,* special guardian of infant respondents (children of Ralph C. Carroll).

*Charles H. Griffiths* of counsel [*Pearce H. E. Aul* with him on the brief; *Griffiths & Content,* attorneys], for Harold A. Content, executor-petitioner.

UNTERMYER, J.   William Carroll died on November 2, 1910. By last will and testament, admitted to probate in the Surrogate's Court of New York county, he created a trust of the residue of his estate for the benefit of his wife, Grace Carroll, during the term of her life.   Upon her death it was provided that the trust be divided into two equal shares.   One of such shares was directed to be further held in trust for the benefit of the daughter Elsa, now Elsa C. Milliken, for the term of her life, the other share for the benefit of the son Ralph for the term of his life.   The will of William Carroll further provided that Elsa should have power to appoint the share set apart for her benefit " to and among her children or any other kindred who shall survive her and in such shares and manner as she shall think proper."

The mother, Grace Carroll, is still living, but the daughter Elsa died on June 26, 1933, leaving surviving her no children or descendants.   By her last will and testament, dated October 13, 1931, admitted to probate in the Surrogate's Court, New York county, she purported to exercise the power of appointment by directing that the share held in trust for her benefit under the will of her father should be distributed, $5,000 to her brother Ralph, $250,000 to her cousin, Paul Allan Curtis, with the provision that in the event he should predecease her that sum be

paid to his son, Paul Allan Curtis, Jr.; the residue to be held for her nephews, the sons of her brother Ralph, during their minority and paid to them upon attaining the age of twenty-one years.

On the day that Elsa C. Milliken executed her will, Curtis signed a letter addressed to her and providing as follows:

"I am informed that by your last Will and Testament you have given and bequeathed to me the sum of Two hundred and fifty thousand ($250,000.00) Dollars.

"In the event that you should predecease me and I should receive the bequest aforementioned, I hereby promise and agree, in consideration of the said bequest, that I will pay to your husband, Foster Milliken, Jr., the sum of One hundred thousand ($100,000.00) Dollars out of the said bequest which you have given to me by your said Will."

Curtis testified that this letter was written at his suggestion, made in conversation with Mrs. Milliken. The uncontradicted testimony of the petitioner, who acted as Mrs. Milliken's attorney in the preparation of the will and the letter of October 13, 1931, corroborated by the testimony of Curtis, is to the effect that Curtis did not participate in the composition of the letter, which, though signed by Curtis, was composed in terms "a little too lawyer-like" to effectuate the understanding of the parties. There is no suggestion in the record that the appointment of $250,000 to Curtis was in consideration of the payment by him of $100,000 thereof to Foster Milliken, Jr., except the statement, supplied by the attorney, in the letter prepared by him. Indeed, the record, considered in its entirety, is wholly inconsistent with the thought that the testatrix appointed $150,000 to Curtis in consideration of his promise to pay the additional $100,000 to her husband. The only reasonable interpretation to be placed upon the transaction is that Mrs. Milliken desired to appoint $150,000 to her cousin, Paul Allan Curtis, and an additional $100,000 to her husband, who she realized was not a proper object of her power of appointment.

This proceeding was instituted by one of the executors of Elsa C. Milliken for a judicial construction of her will with particular reference to the exercise by her of the power of appointment conferred upon her under the will of her father, William Carroll. The surrogate in a carefully considered opinion overruled the objections interposed by Ralph C. Carroll to the exercise of the power of appointment by Elsa C. Milliken, except that he held the appointment of the sum of $250,000 to Paul Allan Curtis to be wholly invalid for the reason that it was contemplated that

$100,000 thereof should be paid by Curtis to Elsa's husband, Foster Milliken, Jr., to whom she could not have appointed under the provisions of her father's will, limiting the power to "her children or any other kindred."

With a single exception we concur in the conclusions of the surrogate. We agree that under the particular provisions of the will of William Carroll the expression "children or any other kindred" was not intended to be limited to "next of kin" and that consequently valid appointments could be made by the testatrix to her cousin, Curtis, and to the children of her brother Ralph. We likewise agree that the exercise of the power of appointment to the children of Ralph is not void as suspending the power of alienation for more than two lives in being, for the reason that vesting of title was not postponed beyond the second life, but only possession and enjoyment, until each child attained the age of twenty-one years. We are also in accord with the surrogate in so far as he held to be invalid the exercise of the power of appointment to Curtis to the extent of the sum of $100,000 intended to be paid by Curtis to Foster Milliken, Jr., who was not "kindred" of the testatrix and hence not a proper object of the power of appointment conferred upon her by the will of her father, William Carroll.

We are, however, of opinion that the lawful appointment to Curtis is severable from the unauthorized appointment intended indirectly to be made to Foster Milliken, Jr., and should be sustained to the extent of $150,000. In this respect, especially upon the facts disclosed in this record, it is as if the testatrix had appointed $250,000 to Curtis with instructions to pay $100,000 thereof to her husband. Had she attempted to do this, we think there would be no difficulty in deciding that the valid appointment of $150,000 to Curtis would not have been vitiated by the unauthorized appointment of $100,000 to a person to whom no appointment could properly be made.

The rule is established by abundant authority that where the exercise of a power of appointment is the result of a "bargain behind," as it has been called, whereby the donee has attempted to effectuate a purpose not authorized by the power, it is in the nature of a fraud upon the power which will render the appointment unenforcible. (*Matter of Marsden's Trust*, 4 Drewry, 594; 62 Reprint, 228 [1859]; *Birley* v. *Birley*, 25 Beav. 299; 53 Reprint, 651 [1858]; *Pryor* v. *Pryor*, 2 DeG., J. & S. 205; 46 Reprint, 353 [1864].) Necessarily also, where the authorized exercise of a power is so connected with the unauthorized that separation is impossible, the court is constrained to refuse enforcement of the

entire appointment. Where, however, it is possible to sever the valid from the invalid by separating the good from the bad, the appointment will be invalidated only to the extent of the unauthorized intention. (*Lane* v. *Page*, 1 Ambler, 233; 27 Reprint, 155 [1754]; *Aleyn* v. *Belchier*, 1 Eden, 132; 28 Reprint, 634 [1758]; *Topham* v. *Duke of Portland*, 1 DeG., J. & S. 517; 46 Reprint, 205 [1863]; affd., 11 H. L. Cas. 32; 11 Reprint, 1242; *Whelan* v. *Palmer*, L. R. [1888] 39 Ch. Div. 648; *Viant* v. *Cooper*, 76 L. T. 768 [1897]; *Ranking* v. *Barnes*, 33 L. J. [Ch.] 539 [1863]; 49 C. J. 1300; Snell's Principles of Equity [21st ed.], p. 469.) Thus in *Whelan* v. *Palmer* (*supra*) it was said: " Notwithstanding a contrary view in some cases, it has now been I think definitely settled, and particularly by that judgment of Lord Justice TURNER in *Topham* v. *Duke of Portland*, that where you can see your way to sever the honest part from the dishonest part, using the words in the legal sense, that is to say, that which is legally right from that which is legally wrong, then you may give effect to that which is legally right, notwithstanding that you are obliged to avoid that which is legally wrong."

The distinction is illustrated by the celebrated case of *Topham* v. *Duke of Portland* (*supra*), upon which much emphasis has been laid. There are two branches of that case, both of which eventually were decided by the House of Lords. The first phase involved a fund of £52,000. The elder Duke of Portland had sought to prevent the marriage of his daughter, Lady Mary, to a suitor to whom he was opposed and, with this in mind, had transferred £52,000 to his three sons in trust for his two daughters, Lady Harriet and Lady Mary, to pay the income to them in such proportions and under such restrictions as during his lifetime he, or, after his death, the successor Duke of Portland might by deed appoint. The elder duke died and subsequently the younger duke sought to exercise the power by appointing one-half of the income to his sister, Lady Harriet, for her absolute use, the other half to be held by her in abeyance and to be paid ultimately to Lady Mary or her issue if deemed wise, otherwise to Lady Harriet. It was held that the appointment of the additional one-half of the income to Lady Harriet was invalid and that the invalidity so affected the exercise of the power of appointment as to cause the entire scheme to fail, because, as the lord chancellor observed: " Lady Harriet was never placed in the position in which it is clear that the Duke desired that she should be placed, and considered her to be placed, namely, in the position of a person having the absolute ownership of the fund, and left at liberty to deal with the whole, or any part of the fund, in such manner as she should think right. The Duke, by his agents, controlled the whole of the disposition of the fund."

The second phase of the *Duke of Portland* case dealt with a trust fund amounting to £16,000. The elder duke by a settlement made in 1795 held a power of appointment to the younger children of his marriage in such shares and proportions as he might determine. The evidence indicated that he intended to give £8,000 to each of his children, except to Lady Mary, over whom, for the reasons previously stated, he desired to retain a certain measure of control. Eight thousand pounds intended for his son Lord Henry and £8,000 intended conditionally for Lady Mary were included by him in a single deed, under which £16,000 were paid to bankers to the credit of Lord Henry. Lord Henry thereafter signed an order directing the bankers to place £8,000 in the joint names of his brother and the agent for the estate, dividends to be credited to the account of "M." Then Lord Henry executed a declaration of trust to the effect that the funds were held subject to the power of appointment by the Duke of Portland or Lord Henry, and in the event of the failure to exercise that power, to be held in trust for Lord Henry, his executors, administrators or assigns, absolutely. The master of the rolls held the appointment of the entire £16,000 to Lord Henry to be void. (S. C., 31 Beav. 525.) The Court of Appeal in a decision (1 DeG., J. & S. 517; 46 Reprint, 205), subsequently affirmed by the House of Lords (11 H. L. C. 32; 11 Reprint, 1242), held the appointment of £8,000 to Lord Henry to be valid and that only the excess of £8,000 was void as an attempt by the duke to delegate the power vested in him alone by the settlement of 1795. Said the court: "His Honor however has held this appointment to be bad as to the whole of the £16,000, upon the general rule, that where an appointment is made for a bad purpose, the bad purpose affects the whole appointment, and His Honor has relied upon *Daubeny* v. *Cockburn* (1 Mer. 626), in support of this view. That this general rule is correct when applied to cases in which the evidence does not enable the Court to distinguish what is attributable to an authorized from what is attributable to an unauthorized purpose, I feel no doubt; but if the evidence enables the Court to make this distinction, the foundation on which the rule rests, the impossibility of distinguishing what is attributable to one purpose from what is attributable to another, wholly fails; and the general rule therefore cannot, as it seems to me, apply. * * * The conclusion at which I have arrived as to this appointment is, that Lord Henry is entitled to £8,000 under it, and that it is bad only to the extent of £8,000."

In the present case the testatrix has appointed $250,000 to her cousin, Paul Allan Curtis. One hundred thousand dollars of that appointment is invalidated by the arrangement whereby Curtis agreed to make a disposition of this sum in favor of a party not a proper object of the power, but the " bargain " is limited to that portion of the bequest. There is a " bargain " only where " the just result of the evidence is, that the appointment would not have been made but for the bargain." (*Pryor* v. *Pryor, supra.*) The residue of $150,000 intended to be paid to Curtis was in no way affected, and the proof shows that it was in no way influenced, by that arrangement. This is demonstrated by many circumstances, too strong to be resisted, which established the intention of the testatrix that in any event Curtis should receive $150,000 under the appointment. There is, in the first place, the circumstance that under her previous will, executed in March, 1931, she bequeathed $50,000 to Curtis and $50,000 to his son. There is no suggestion that there was any condition attached to these bequests. On the contrary, in her earlier will she had given the residue of the fund to her brother Ralph with an earnest exhortation to pay $10,000 annually to her husband. The petitioner testified that at the time of the execution of the will of October 13, 1931, the testatrix expressed a desire to increase these bequests, aggregating $100,000, but perceived no necessity to make separate provision for Curtis' son. Curtis likewise testified that the testatrix had told him of her intention to increase by $50,000 her previous bequests of $100,000 to him and to his son and to bequeath to him an additional $100,000 to be paid by Curtis to her husband. It was also decided, and the will so provides, that if Curtis died before the testatrix the entire $250,000 should go to his son. Had Curtis died, certainly no condition of any kind would have attached to this bequest to his son. All this evidence establishes, quite conclusively we think, that it was the intention of the testatrix to make a bequest to Curtis in part unconditionally, and to the extent of only $100,000 subject to a condition which was in derogation of the power. To such a situation the strict rules of the common law applicable to illegal contracts do not necessarily apply. The action of the testatrix, even in respect to the $100,000 intended for her husband, was not unlawful but unauthorized and, because unauthorized, was void. The term " fraud on a power," frequently to be found in the decisions, must be read in the light of that distinction. " The term fraud in connection with frauds on a power does not necessarily denote any conduct on the part of the appointor amounting to fraud in the common law meaning of the term or any conduct which could be properly termed dis-

honest or immoral. It merely means that the power has been exercised for a purpose, or with an intention, beyond the scope of or not justified by the instrument creating the power." (By Lord PARKER in *Vatcher* v. *Paull*, L. R. [1915] A. C. 372.)

The decree of the surrogate should be modified to the extent of determining that the appointment to Paul Allan Curtis in subdivision (b) of paragraph second of the last will and testament of Elsa C. Milliken is a valid bequest in the sum of $150,000; otherwise, the decree, so far as appealed from, should be affirmed.

MARTIN, P. J., and DORE, J., concur; GLENNON and COHN, JJ., dissent and vote to affirm on opinion of surrogate. [See 153 Misc. 649, for opinion of FOLEY, S.]

Decree modified to the extent of determining that the appointment to Paul Allan Curtis in subdivision (b) of paragraph second of the last will and testament of Elsa C. Milliken is a valid bequest in the sum of $150,000; otherwise the decree, so far as appealed from, is affirmed. Settle order on notice.